Filed 5/21/21  P. v. Flores CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. ROBERT ANTHONY FLORES, Defendant and Appellant. | F078233 (Super. Ct. No. F15907539) **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Mark W. Snauffer, Judge.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Robert Anthony Flores was convicted by jury of committing a lewd act upon a child (Pen. Code,[1] § 288, subd. (a); count 1) and sexual battery by restraint

---

[1]    All further undesignated statutory references are to the Penal Code.

(§ 243.4, subd. (a); count 2) against his stepdaughter, D., and continuous sexual abuse (§ 288.5; count 3) against his stepdaughter, J. As to counts 1 and 3, the jury found appellant had engaged in substantial sexual conduct with a person under the age of 14 (§ 1203.066, subd. (a)(8)). In addition, as to counts 1 and 3, the jury found appellant had committed the offenses against multiple victims.

Appellant was sentenced to a prison term of 15 years to life on count 1 (§ 667.61, subd. (b)), a consecutive term of 15 years to life on count 3 (§ 667.61, subd. (b)), and the middle term of three years on count 2, to be served concurrently.

On appeal, appellant contends the judgment in its entirety must be reversed because expert testimony was admitted which exceeded the permissible scope of Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence and rendered his trial fundamentally unfair. Appellant also contends his conviction in count 3 must be reversed because section 288.5 violates his state constitutional right to a unanimous verdict and his federal constitutional right to due process.

In addition, appellant raises several sentencing errors. He contends his life sentences on counts 1 and 3 the court imposed pursuant to section 667.61 are unauthorized because they violate ex post facto laws. He also contends the trial court sentenced him to consecutive terms on counts 1 and 3 based on the mistaken belief doing so was mandatory. Finally, he contends fines and fees must be stricken because the trial court made a finding that he had the inability to pay them but imposed them anyway under the law prior to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). We agree the matter must be remanded for resentencing because the life sentences violate ex post facto laws and so the sentencing court may reconsider the imposition of consecutive terms. On remand, appellant may raise his inability to pay argument. In all other respects, the judgment is affirmed.

## FACTS

In 2006, appellant married Tina, who had children from a previous relationship, including J. and D. When appellant and Tina were married, J. was approximately five years old and D. was approximately 10 years old. Appellant, Tina, J., and D. all lived together in various homes.

J. was a junior in high school when she testified at trial. J. testified appellant first sexually abused her when she was about five years old. On this first occasion, appellant had called her into a detached room in the backyard across from the garage when no one else was home. Appellant, who was drinking and listening to music, stopped what he was doing, picked J. up, and laid her on the floor on her stomach. Appellant then pulled J.'s pants and underwear down to her ankles. When J. tried to get up, appellant held her shoulders down. Appellant started to rub J.'s butt with his hands on the outside of and in between her butt cheeks. Appellant put his penis in between J's butt cheeks but not inside her. Appellant was lying on top of J. and moving "up and down." A similar incident happened a week or two later in appellant and Tina's bedroom in the main house.

J. testified incidents like this happened "a lot," more than 20 times, when the family was living at that house. A year or two later, when J. was in first grade, the family moved to another house. They were at that house for about a year, and multiple similar incidents occurred, about 10 times by J.'s approximation. The family moved again when J. was in the fourth grade. At that home, additional incidents occurred. The incidents started out the same way as the very first, but appellant began penetrating her anus with his penis. About 20 more incidents of similar sexual abuse occurred at this house; sometimes appellant would just put his penis in between J.'s butt cheeks, and other times, he would penetrate her anus. On one occasion, while J. was in seventh grade, appellant penetrated her vagina with his penis.

3.

The incidents always occurred when Tina was out doing something and J. was home alone with appellant. J. tried to avoid being alone with appellant by going to her grandmother's house, asking to go with Tina when she left the house, or hiding in her bedroom and the bathroom. At one point, the incidents stopped. Appellant then stopped drinking and began attending church regularly.

On cross-examination, J. testified she thought appellant was her biological father until she was 13 years old. She had since started spending time with her father's side of the family. Defense counsel introduced family photographs of J. with appellant. Tina and appellant had strict rules regarding J. seeing boys.

D. was 21 years old when she testified at trial. When D. was approximately 11 or 12 years old, appellant began making sexual comments to her that made her feel uncomfortable, such as telling her that he liked her butt. On one occasion, around that time, she walked past him and he grabbed her butt and squeezed it. Appellant often exposed himself to D. around the house by pulling down the front of his pants.

D. testified appellant would often pull D.'s pants down and put her face down on his and Tina's bed, pull her underwear down to her knees, hold her down with his body weight, and rub his penis on her butt. Appellant grunted a lot and moved up and down while doing this. D. was not sure if appellant penetrated her anus. D. had a hot and sticky substance on her afterward. This happened more than 20 times. D. testified appellant did this whenever he got the chance when Tina was not home. D. did not tell Tina or J. about what happened. At one point, D. did tell her brother's girlfriend, who told Tina. D. left home after she graduated high school because of the sexual abuse.

The final incident that caused D. to move out of the home occurred in appellant's office. Appellant had been drinking and he pulled his pants down and rubbed his penis on D. D. tried to get away but he was too heavy and he placed his penis on her butt.

On cross-examination, D. testified the household was strict and she and J. were never allowed to go anywhere; they just went to school and did their chores and

4.

homework at home. D. testified she had a boyfriend in high school that she did not tell Tina or appellant about. They found out about him because she was caught with him in a bathroom across the street from the school. To punish D. for this incident, Tina hit D. and grounded her for "a long time." The defense introduced father's day and birthday cards that D. made for appellant. D. wrote messages of appreciation and love to appellant in the cards. D. testified she once loved appellant because he was a good person and nice when he was sober, but she no longer loved him.

In December 2015, J.'s choir teacher observed J. presenting as "very shut down" and exhibiting troubling behavior. The teacher called J. into her office to speak with her because it appeared her anxiety was growing and the physical signs of her shutting down seemed to increase. The teacher asked J. if she was being physically, mentally, sexually, or emotionally abused at home. J. responded by saying, "Well, not now." The teacher asked J. if she meant she had been sexually abused, and J. then told the teacher she had been sexually abused from the age of five to the age of 12 but that she had never told anyone. The teacher asked if it was someone she lived with, and J. responded that it was her stepfather.

J. testified the teacher was the first person to whom she disclosed the abuse. She never told Tina because she assumed Tina would take appellant's side. She never planned on talking about it but felt comfortable with the teacher, and the teacher's questioning just brought it out of her. J. said she appeared upset the day the teacher called her into the office because D. had just moved out a couple of weeks prior and she really missed her.

After school that day, J. went to the home of her maternal grandparents, Curtis and Patricia. Later that afternoon, officers from the Fresno Police Department and a child protective services (CPS) worker came to the house to discuss the allegations.

J. told one of the officers who initially arrived that appellant had had sexual intercourse with her about once a week from the time she was five years old until she was 12 years old.

Detective Jennifer Federico responded to the residence and had Patricia call Tina and have her come to the house. When Tina arrived, Federico told her J. had accused appellant of sexually abusing her. Tina did not believe it and said that J. and appellant were never alone together and that J. was lying.

While Federico was speaking with Tina, D., J., and Curtis were in a room in the back of the house together. Curtis asked D. what she thought about the allegations, and D. responded that she believed J. because appellant had done the same thing to her. Curtis then went to get Federico's partner's attention and told him D. was also making an allegation against appellant. Federico's partner, Detective Michael Martin, went back to speak with D., who was crying and told him appellant did the same thing to her. When Martin asked for clarification, D. responded that appellant had put his penis in her butt. Based on there being two victims, Federico and Martin decided to take the girls and appellant to the station for interviews. Federico transported the girls to the station and asked them not to talk to each other about the case. Someone was always with them to make sure they did not communicate about the case.

Audio recordings of J.'s and D.'s police interviews were introduced at trial by the defense. In J.'s interview, she said the first incident where appellant rubbed his penis on J.'s butt happened in the bedroom and that appellant had asked J. if she wanted to play a game on his phone before touching her. This happened about 10 times, and when J. was nine or 10 years old, appellant began inserting his penis into J.'s anus. This happened approximately two to three times per week, and maybe 20 times total. Once or twice, appellant placed his penis inside J's vagina.

6.

D. told the police that the first incident occurred when she was 13 or 14 years old and she had never told anyone about it. She also stated her family thought that Tina's previous boyfriend before appellant had molested D.

A video recording of appellant's interview was played for the jury. Appellant initially denied the allegations that he sexually abused J. Eventually, after Federico told appellant that D. had made similar allegations, appellant responded, "So I don't know then. Maybe I did when I was drunk. I don't know. I – I don't know. Why didn't they say something then instead of today? Or yesterday or next week, like…." Appellant went on to say, "if I did do something like that, God forgive me." Appellant explained he was a "bad alcoholic" and would forget how he spent his money after drinking the day before. He admitted he would drink upon waking up in the morning and would also drink at work at times. Martin asked appellant, "But deep down inside of you, what do you … think? It's not like this possibly could happen?" Appellant responded, "It probably could have, I don't know. That's why I'm trying to be real, brother." He stated he did not remember doing anything. Following the interview, Federico arrested appellant.

**Defense Evidence**

Tina testified on behalf of appellant and stated the girls were not telling the truth. She stated J. was upset with her and appellant for not telling her that appellant was not her biological father, and that D. is a "conniver," liar," and "exaggerator." CPS had prevented Tina from seeing J. because Tina does not believe J. Tina believed D.'s motivation to lie was to support J. D.'s brother's girlfriend never told Tina that D. was being abused by appellant. Tina testified she knows appellant did not do it and has no doubts.

A church friend of D.'s testified that she and D. were very close. D. confided in her and they spoke almost every day. D.'s friend was very surprised to hear about the

7.

allegations against appellant. D. never told the friend, and it was surprising she would not tell her something. D.'s friend testified D. does not tell the truth all the time.

Appellant's employer testified he had known appellant since 2005 and appellant was gentle, reliable, honest, an impeccable employee, and a good person. At the time of trial, appellant still worked for the employer. On cross-examination, the employer testified he would be surprised to know that appellant admitted to being under the influence of alcohol at work.

Appellant's daughter testified that appellant was always nice, even when he was drunk and he never abused her.

J. and D.'s grandfather Curtis testified the afternoon the police arrived at his house, J. never said anything about them coming, and when they arrived, J. buried her head into Curtis's arm. When D. arrived at his house, she went up to J. and asked, "What teacher did you tell this to? Did you tell it to one of my teachers?" When Curtis was in the back room with them, they were mumbling back and forth. When Tina was talking with the detectives, the girls were outside together. Curtis was surprised "[r]ight down to the ground" to hear of the allegations. Curtis stated the girls never had anything bad to say about appellant and called him "Dad." According to Curtis, appellant was a good father who never raised his voice. Curtis said he did not believe the girls, and that it seemed like "every word that comes out of [D.'s] mouth is a lie."

J. and D.'s grandmother Patricia testified that she was "excited" to be in court because she knew appellant was innocent. Patricia was certain the girls were not telling the truth because she "know[s]" them. According to Patricia, appellant was a good parent and a "god-loving" man who had "never, ever … done anything wrong." When appellant was drunk, his demeanor was "loving." Patricia said that the day the police came to her house, J. was laughing when speaking to the officers.

In closing argument, defense counsel argued that J.'s "overly-vigilant" choir teacher prompted J. to make the allegations against appellant, and D. lied to back up J.'s

8.

allegations after speaking with her at the grandparents' house in order to help her get out of the strict household. He pointed out the inconsistencies between D.'s testimony and her statements to the police. Defense counsel argued that J. made up the allegations because she was spending more time with her biological dad and his family who had fewer rules. Counsel argued that J. could not have experienced what she said she experienced because she made unbelievable statements such as not knowing whether appellant's penis was erect, stating his ejaculate was cold, and she did not say it hurt when asked how penetration of her anus felt. Counsel went on to say J. may have been truthful but substituted appellant for another perpetrator. Finally, he pointed out inconsistencies between J.'s testimony and her statements to the police.

## DISCUSSION

### I.   CSAAS Expert David's Love Testimony

#### A.   *Relevant Procedural Background*

The prosecution moved in limine to introduce CSAAS testimony to explain why J. and D. might have failed to report the abuse earlier than they did. Appellant moved in limine to preclude CSAAS testimony unless the prosecution identified the myth or misconception the evidence was proffered to rebut. The court reserved ruling on the CSAAS motions until J. and D. testified to more accurately determine whether the evidence could be properly introduced and what the scope would entail.

Following J.'s and D.'s testimony, an Evidence Code section 402 hearing was held during which defense counsel conducted a voir dire examination of Love. Prior to Love's testimony at the hearing, the prosecutor gave an offer of proof that Love would testify as to CSAAS and misconceptions that common people may have about child victims reporting sexual abuse. The prosecutor explained the majority of Love's testimony would be discussing the delayed reporting and the reasons why through discussion of the elements of CSAAS. Following Love's testimony, the court stated Love would be permitted to testify but limited Love's testimony to CSAAS and delayed

9.

reporting. The court noted Love was not permitted to testify about statements he made during the hearing about "grooming" or his statement that only one percent of alleged child sexual abuse victims lie.

### B. Love's Testimony

Before Love testified before the jury, the trial court instructed the jury that Love's testimony on CSAAS was not evidence that appellant committed any of the crimes charged and that the jury was only to consider the evidence in deciding whether or not J.'s or D.'s conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of their testimony. (CALCRIM No. 1193.)

Love is a licensed marriage and family therapist with over 40 years of experience working with child sexual abuse victims. He has also taught and conducted research in the field of child sexual abuse. Love testified he knew no facts or details related to the case and had not spoken with any witnesses or appellant.

Love testified that CSAAS was "a description of a clinical study" conducted to look at the "typical reactions of children who had been sexually molested." The study looked at child sexual molestation victims who were in treatment. The study was undertaken because those children "acted" and "responded" "in certain ways" that led others, such as their parents and investigators, not to believe them because the behaviors were "somewhat different or unique or sometimes, unless you really understood sexual molest, didn't make sense." Examples of this behavior were delaying disclosure of sexual abuse, secrecy surrounding the issues because the children were embarrassed, intimidated, or threatened, and inconsistent disclosures due to trauma.

A group of clinicians met, Love being one of them, in 1979 to discuss the need for consolidation of the information to help them explain sexual molestation to those outside the field. Dr. Roland Summit, who at the time was head physician at UCLA Harbor View Medical Center, compiled data provided by the clinicians and wrote an article entitled, "The Child Sexual Abuse Accommodation Syndrome," wherein he summarized

10.

the information and data to "better explain it to others who were working with children so that the children got assistance or got believed in times in which they were truly molested." The article was intended to educate those who were not therapists to understand the children and "if indeed children had been molested, they wouldn't disregard what they were saying because it didn't kind of make, quote, common sense, but, in fact, it was pretty consistent with most other sexually molested kids." There are five basic categories to the CSAAS: secrecy; helplessness; entrapment and accommodation; delayed, unconvincing disclosure; and retraction.

Love testified that secrecy "is what makes child sexual abuse function and work." A perpetrator generally selects a child who is vulnerable or interacts with the child in such a way that intimidates them so that they do not tell anyone about the abuse. Some sort of "coercion or manipulation need[s] to take place" so the child does not disclose. When asked by the prosecutor to expound upon whether a power imbalance affects the child's ability or inclination to disclose, Love further testified that "[m]ost people" have a preexisting relationship with their abuser, such as an uncle, aunt, mother's boyfriend, or priest. The child's idea that adults are more likely to believe adults puts the child into a helpless position.

As to "helplessness," Love testified the majority of abuse happens in a setting such as home, boy scout camp, or at school "which should be safe." Love explained "[o]ne of the most common reactions" is that sexually abused children are "functioning in a manner where they are not confident" and thus feel helpless. The children do not feel comfortable coming forward right away, and "Summit said very clearly please do not disregard what a child says when they finally come forward because they were placed in a very helpless, vulnerable position by this older, more domineering, more powerful, more important person in their life, creating a situation that makes sense when you understand the dynamics of the child sexual abuse; why they were not able to come forward, why they were helpless, why they didn't tell right away, why they didn't explain

11.

this to others." An abused child, "particularly a highly traumatized" one, would not see running away as an option.

As to "entrapment" and "accommodation," Love testified that "Summit was trying to explain why kids stay in the situation." Love explained children who have been molested do not feel they have been taken advantage of but that they have done something wrong, so they are "basically trapped" and need to "learn to live with it somehow or another," which are characterizations of the accommodation category. Love stated many of the children studied in the CSAAS article had posttraumatic stress disorder. Summit "looked at what are some of the typical coping mechanisms, and those mechanisms sadly led to the point that people started using them to discount what children were saying." Adolescents may increase drug and alcohol use or engage in self-harm. Younger children refuse to go places where they are being molested. Or the child may freeze rather than fight and are nice to the offender, say "okay things about" them, and go places with them because the child's "fear level is so high."

As to delayed or inconsistent disclosures, Love testified of the children observed for the CSAAS article, "very few came forward within the first few months or often in the first year or so." Love stated though that can be construed to mean the abuse did not happen, the research showed the children were delaying disclosure because they had accommodated to the abuse. Love explained, "[W]e [the clinicians involved in providing data for Summit's article] wanted to say delaying is not at all something that people should use to disregard what a child has said; and, in fact, most sexually molested kids delay for some period of time. Over half never tell." Love testified for a child to come forward "[s]omething has to happen" in his or her life such as reaching a point of safety or not having the offender around anymore.

Love testified victims of sexual assault can sometimes give conflicting accounts at different times of what happened. Love explained there are two types of memory: core memory and peripheral memory. Core memory covers the sexual acts and peripheral

12.

memory covers details like what the offender said and what his clothing looked like. Love testified that core memory "encodes really well" and on recall "has a tendency to be more consistent and accurate." Peripheral memory, on the other hand, "has a tendency to be vague, out of [sequence]." Love went on to say children get interviewed again and again after a report is made and "we find over those multiple interviews, by the nature of memory, there will be some changes." They sometimes remember something they had not disclosed previously. Love then stated: "So the [CSAAS] article was trying to say because they don't remember all the pieces, some of the information isn't consistent across all interviews, they can't always remember everything, take a look at the core [memory] and do you feel like that part is logical within the rest of the information and is supportive of the accusation [the] child is saying."

Love testified that retraction takes place in a limited number of cases. That is, after a child victim has already disclosed abuse occurred, they later say it did not happen. Love said, "the question that the Summit article wanted to say was be careful and look to make sure that someone hasn't gotten to them, someone hasn't intimidated them, that you … aren't asking questions in a highly stressful environment, like in court, where the child is so stressed that they are really flustered and therefore the best out is to say 'I don't know. I don't remember. I'm not sure it happened.' " Love explained sometimes it is painful or uncomfortable or the stress level is high and stress can cause problems with recall.

The court instructed the jury with CALCRIM No. 1193 on the proper use of Love's testimony a second time before closing argument.

### C. Analysis

Appellant makes several claims of error with regard to the admission of various aspects of Love's testimony. Though appellant's counsel moved in limine to exclude Love's testimony and requested a section 402 hearing to determine what the scope of Love's testimony would entail, there were some portions of Love's testimony which

13.

appellant challenges and to which trial counsel did not specifically object. Respondent contends the failure to specifically object to the challenged portions of Love's testimony forfeited appellant's claims. To the extent we find any of appellant's claims have been forfeited, appellant contends his counsel rendered ineffective assistance by failing to object below. Without deciding whether appellant forfeited any of his claims, we review them on their merits because such is relevant to his ineffective assistance of counsel claim.

We will not disturb a trial court's decision to admit expert testimony on appeal unless a manifest abuse of discretion is shown. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).)

Expert testimony on CSAAS, or "the common reactions of child molestation victims" is admissible " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin, supra*, 53 Cal.3d at pp. 1300–1301.) It is inadmissible, however, to prove the abuse occurred. (*Id*. at p. 1300.)

Courts have recognized that CSAAS evidence is at risk of being "misapplied as a predictive index by the jury." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393 (*Bowker*).) Thus, the evidence must be tailored to the purpose for which it is being received; it must be "targeted to a specific 'myth' or 'misconception' suggested by the evidence" though the prosecution does not have to identify the specific misconception to be addressed. It is sufficient if the victim's credibility is placed in issue due to paradoxical behavior, such as delay in reporting a molestation or in inconsistent statements. (*Bowker*, at pp. 393–394; see, e.g., *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745.) Further, a limiting instruction that CSAAS evidence is not intended and should not be used to determine whether the victim's molestation claim is true can help reduce the risk that a jury misuses CSAAS evidence. (*Bowker*, at p. 394.) There is a split among the Courts of Appeal as to whether a trial court is required to give a limiting

14.

instruction sua sponte.  (*People v. Housely* (1992) 6 Cal.App.4th 947, 958–959 [court is required to give limiting instruction]; *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1073–1074 [the court need only give the instruction if requested]; but see *People v. Humphrey* (1996) 13 Cal.4th 1073 [where the Supreme Court repeatedly referred to the trial court's duty to give a limiting instruction on the use of battered women's syndrome evidence on request].)

### 1. Alleged Violation of Guidelines Set Forth in *Bowker*

Appellant first contends Love exceeded the permissible scope of CSAAS evidence as described in *Bowker*, *supra*, 203 Cal.App.3d 385 by improperly (1) eliciting sympathy for child victims and advocating that they should be believed and (2) tracking the facts of appellant's case.

In *Bowker*, the appellate court found the prosecutor had led the CSAAS expert "on a testimonial excursion which far exceeded the permissible limits" of the evidence. (*Bowker*, *supra*, 203 Cal.App.3d at p. 394.)  Of the expert's transgressions were making comments "designed to elicit sympathy for child abuse victims and solicitations that children should be believed."  The expert in that case "in effect said regardless how inconsistent a child's accounts of abuse are, abused children give inconsistent accounts and are credible nonetheless." (*Ibid.*)  Further, the *Bowker* expert testified to facts which "directly coincided" with facts in the case. (*Ibid.*)  Finally, the expert "constructed a 'scientific' framework into which the jury could pigeonhole the facts of the case," allowing the jury to "superimpose these children on the same theory and conclude abuse had occurred." (*Id.* at p. 395.)

Citing *Bowker*, appellant first argues that Love improperly elicited sympathy for child abuse victims and that they should be believed regardless of how inconsistent a child's account is.

15.

We set forth the portions of Love's testimony that appellant contends runs afoul of this limit in italics placed within the context in which it arose as it is relevant to our analysis:

- While testifying on the category of helplessness, Love testified: "The article was explaining the common reactions of sexually molested children. One of the most common reactions is that they're functioning in a manner where they are not confident. They feel helpless. They don't feel comfortable coming forward. They don't explain to others. And so therefore, because they don't come forward right away, because they can't tell or don't tell, Summit said very clearly *please do not disregard what a child says when they finally come forward* because they were placed in a very helpless, vulnerable position by this older, more domineering, more powerful, more important person in their life, creating a situation that makes sense when you understand the dynamics of the child sexual abuse; why they were not able to come forward, why they were helpless, why they didn't tell right away, why they didn't explain this to others."

- While testifying on the category of delayed disclosure, Love testified: "[Of the children studied for the CSAAS article], very few came forward within the first few months or often in the first year or so and told anybody, which could be construed as, well, maybe it didn't happen because they didn't tell anybody. In the body of information collected from this, large number of children said, no, they're delaying because they've accommodated. They're in fear. They're afraid. So we [the clinicians who provided the data for the CSAAS article] wanted to say *delaying is not at all something that people should use to disregard what a child has said*; and, in fact, most sexually molested kids delay for some period of time."

- While continuing to discuss the delayed disclosure category, Love testified: "So the [CSAAS] article was trying to say *because [child victims] don't remember all the pieces, some of the information isn't consistent across all interviews, they can't always remember everything, take a look at the core [memory] and do you feel like that part is logical within the rest of the information and is supportive of the accusation [the] child is saying*."

- On the retraction category, Love testified: "So [the CSAAS article] was a word of caution that *if they retract some things, don't throw out everything because a piece of it may not be there any longer*."

Appellant acknowledges that a CSAAS expert is permitted to explain that "generally speaking, delays, inconsistencies, and retractions are not uncommon," but argues by making the above comments, Love, "t[ook] the additional step of telling a jury that 'children should be believed' and 'regardless how inconsistent a child's accounts of abuse are, abused children give inconsistent accounts and are credible nonetheless,' " citing *Bowker*, *supra*, 203 Cal.App.3d at page 394. We disagree that Love's testimony improperly elicited sympathy for child victims or in effect said the witnesses should be believed.

We start by noting the comments Love made in this case are distinguishable from the expert's comments the appellate court condemned in *Bowker*. In *Bowker*, the expert volunteered, for example, " 'It is very important that a young child, say, any age from four to ten, 12 years old, that they be believed.' " (*Bowker*, *supra*, 203 Cal.App.3d at p. 389.) The *Bowker* expert's testimony accounted for nearly 70 pages of reporter's transcript and was "replete with comments designed to elicit sympathy for child abuse victims and solicitations that children should be believed." (*Id*. at p. 394.)

Here, Love never so directly states that, as a rule, children who make accusations of molestation should be believed no matter what, and we do not believe the comments appellant challenges had the improper effect of saying children "should be believed." Rather, each of Love's comments pointed out by appellant was made in the context of explaining a particular behavior and was meant to reiterate what Love explained was the original intent of the CSAAS article at the beginning of his testimony—to look at typical reactions of children who have been sexually molested to ensure those who hear accusations do not disregard what the children say "because it didn't kind of make, quote, common sense." When Love stated a behavior should not be used to disregard a child's statement in the present case, it was because that behavior *had historically been used to*

*disregard* children's allegations prior to the CSAAS article being published. In context, Love's comments were not advocations that the children be believed but rather an explanation that they should not *not be* believed on the basis they displayed a certain behavior. The function of the comments in context was to neutralize the seemingly self-impeaching behavior rather than advocate for blind belief in children's statements. These comments had substantively the same effect as saying the behavior is not inconsistent with children who have been molested—a permissible use for CSAAS evidence. On the facts of this case, we find the trial court did not abuse its discretion by allowing the above statements.

We agree with appellant to some extent that, on this record, Love approaches, but does not cross, the line of improper CSAAS testimony. In our view, it is best practice for CSAAS experts to simply explain the reasons behind children's seemingly self-impeaching behaviors and state the behaviors are not uncommon. Love's additional commentary relating that the purpose of CSAAS is to encourage fact finders to not "disregard" children's accusations is unnecessary and if these types of comments had been accompanied by more direct statements that children should be believed more akin to the statements in *Bowker*, our conclusion may have been different. Here, however, these types of comments were not pervasive and did not have the cumulative effect of telling the jury the witnesses should be believed simply because they came forward for the reasons we have already stated. To the extent any of Love's comments could be construed as improper advocacy for believing the witnesses, the limiting instruction would have prevented the jury from using the testimony for an improper purpose.[2]

---

[2] To the extent appellant argues the limiting instruction allowed the jury to use the CSAAS evidence to determine appellant is guilty because it stated the jury could consider the evidence "*in evaluating the believability of [the complaining witnesses'] testimony*," we reject this argument. A similar argument has been rejected by the appellate court in *People v. Gonzales* (2017) 16 Cal.App.5th 494, which we find persuasive. The *Gonzales* court held that a "reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the CSAAS] testimony to conclude that [the victim's] behavior does not

18.

Appellant also cites *Bowker* to argue Love presented his testimony in a way which "directly coincided" with the facts of appellant's case and improperly "constructed a 'scientific' framework into which the jury could pigeonhole the facts of the case" as the expert in *Bowker* did, by testifying that (1) victims wait years to disclose abuse and give various inconsistent versions of what happened; (2) abuse is commonly caused by a person the victim knows; (3) some victims say nice things about their abuser; and (4) children do not generally report until they reach a point of safety or until something significant happens in their lives. Appellant says this testimony improperly coincided with the evidence that (1) the girls waited years to disclose the abuse and gave inconsistent accounts between their testimony and statements to the police; (2) appellant was their stepfather; (3) D. wrote nice things in birthday and father's day cards to appellant; and (4) J. told her choir teacher of the abuse after something "significant" happened—D. moving out.

We do not agree with appellant that the facts to which he refers improperly implicated appellant's guilt or improperly created a framework into which the jury could pigeonhole facts. The fact that J. and D. exhibited some of the behaviors discussed by Love does not render the testimony inadmissible. To be admissible, CSAAS evidence must be "targeted to a specific 'myth' or 'misconception' suggested by the evidence." (*Bowker*, *supra*, 203 Cal.App.3d at pp. 393–394.) Consequently, in every case in which CSAAS evidence is properly admitted, the prosecutor's questions and expert's testimony will necessarily mirror the facts of the case to some extent.

---

mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior." (*Gonzales*, at p. 504.) As *Gonzales* explained, "under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Gonzales*, at p. 504.)

Here, Love never suggested to the jury they should use CSAAS to determine whether abuse occurred.  We conclude this portion of Love's testimony remained within the limitations of "observations concerning the behavior of abused children as a class and [] avoid[ed] testimony which recites either the facts of the case at trial or obviously similar facts" (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1384) and there was no abuse of discretion.  Love explicitly acknowledged he had neither met the witnesses nor reviewed any of the reports in this case.  Again, the jurors were instructed they could only use Love's testimony to understand seemingly counterintuitive behavior when evaluating the witnesses' believability.

We conclude Love's testimony did not impermissibly exceed any scope outlined by *Bowker*.

### 2.     Alleged Improper Profile Evidence

Appellant further contends Love testified to improper criminal profiling evidence by testifying that the majority of abuse is committed by someone with a significant or familial relationship with the victim and the victim can be nice to the abuser.  We disagree.

"A profile is a collection of conduct and characteristics commonly displayed by those who commit a certain crime," and is " 'a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity.' " (*People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084.)  "Profile evidence is generally inadmissible to prove guilt." (*Ibid*.)  The appellate court in *Robbie* explained there is a significant difference between profile evidence, which is improper, and evidence "admitted in recognition that a misleading notion existed in the public consciousness and to disabuse jurors of the misconception," which is admissible.  (*Id.* at p. 1087.)

Here, the facts to which appellant refers were not presented to the jury as "profile evidence."  Rather, the testimony that many victims have a preexisting relationship with

their abusers was presented as an explanation for why a child victim may keep the abuse a secret or feel helpless. The function of this testimony was to counteract the misconception that children would report abuse right away. Love's comment that victims can be nice to the abuser was presented as an example of how a victim might "accommodate" the abuse. The function of this testimony was to counteract the misconception that a victim would never be nice to someone who had abused them. We conclude Love did not construct a profile of offenders that the jury could use to determine guilt.

### 3. Alleged Improper Statistical Evidence

Appellant next argues that Love testified as to improper statistical evidence. We disagree.

Juries "must evaluate" the evidence "without statistical evidence placing a thumb on the scale for guilt." (*People v. Wilson* (2019) 33 Cal.App.5th 559, 571 (*Wilson*).) "Where expert opinions on the statistical probability of guilt are admitted, the jury may be 'distracted' from its 'requisite function of weighing the evidence on the issue of guilt,' and may rely instead on this 'irrelevant' evidence." (*People v. Julian* (2019) 34 Cal.App.5th 878, 886 (*Julian*), quoting *People v. Collins* (1968) 68 Cal.2d 319, 327.)

Appellant argues the cumulative effect of Love's testimony that (1) "one out of four women and one out of six men will be molested or raped by the time they're 18 in the … State of California"; (2) "[m]ost" victims have a preexisting relationship with the abuser, such as an uncle, aunt, mom's boyfriend, or priest; (3) the "majority" of abuse happens in a setting such as home, boy scout camp, or at school; and (4) "[o]ver half" never report abuse "suggested that there was a high statistical probability that appellant was guilty" and was thus improper. To support his contention, appellant cites *Wilson*, *supra*, 33 Cal.App.5th 559 and *Julian*, *supra*, 34 Cal.App.5th 878. Both cases are distinguishable.

21.

In *Wilson*, after the CSAAS expert testified about CSAAS, the prosecutor said they wanted to " 'step outside of the accommodation syndrome' " and talk about " 'false allegations.' " (*Wilson*, *supra*, 33 Cal.App.5th at p. 568.) The expert testified that false allegations occur " 'very infrequently or rarely,' " most often during a child custody dispute and that a study found " 'about 4% of cases in which there was an allegation that was determined to be false.' " (*Ibid*.) The *Wilson* court found the practical result of this evidence "was to suggest to the jury that there was an overwhelming likelihood [the victims'] testimony was truthful." (*Id*. at p. 570.) The appellate court concluded the evidence was not relevant and more prejudicial than probative and therefore inadmissible, but that the admission was harmless because the victims testified extensively, other percipient witnesses were called, and the defense offered effective rebuttal expert testimony. (*Id*. at pp. 571–572.)

In *Julian*, the same CSAAS expert who testified in *Wilson* testified that false allegations were infrequent and there were studies purporting to show that only one to eight percent of these types of allegations were false. (*Julian*, *supra*, 34 Cal.App.5th at p. 884.) The appellate court held the statistical evidence was not admissible as CSAAS evidence and deprived the defendant of his right to a fair trial. (*Id*. at p. 886.)

Unlike in *Wilson* and *Julian*, Love made no such statements regarding the probability that a report is false or true. We agree with appellant in part that Love's comment that one out of four women will be molested by the time they are 18 was inappropriate. The comment was volunteered by Love while discussing the element of secrecy. One of the next sentences Love said was, "So we've got a large number of people this happens to in our culture, much higher than we'd like to believe. But we certainly understand now very few of those people tell." In context, Love was not implicating that J. and D. had been molested but that child molestation is widespread and many do not disclose the abuse, which underlined Love's point that the unique circumstances of child sexual abuse can cause secrecy and delayed disclosure. We

22.

conclude that while this comment did not rise to the level of improper statistical evidence akin to that in *Wilson* and *Julian*, it was irrelevant and should not have been admitted. We also conclude however the comment's admission was harmless. We presume the jury would follow the CALCRIM No. 1193 instruction that it must not use Love's testimony for the improper purpose of concluding the victims were molested. Further, the comment was brief and offhanded, and was not highlighted again by Love or the prosecutor during Love's testimony or argument.

The remainder of the "statistical" testimony identified by appellant was relevant in that each comment was an identification of a common reason why child abuse victims would not immediately report sexual abuse. We do not find, as appellant suggests, that the cumulative effect of these comments were that J. and D. were molested. Rather, they were used to explain why children who have been abused display certain behaviors and that those behaviors were not uncommon among child sexual abuse victims.

### 4. Section 352

Appellant argues any probative value of Love's testimony was outweighed by undue prejudice, and therefore the trial court abused its discretion under Evidence Code section 352 by admitting it.[3] We disagree.

Appellant first suggests there was no probative value of the evidence: that it was "totally unnecessary" to the prosecution's case because jurors "were likely already aware" "that sometimes abused children delay in reporting or make inconsistent statements" and thus the prosecution could have "easily" addressed the points in closing argument and by the jury instruction on witness credibility, which instructs the jury not to automatically reject testimony just because of inconsistencies or conflicts. The Court of Appeal in *People v. Munch* (2020) 52 Cal.App.5th 464 has recently rejected the argument

---

[3] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

23.

that CSAAS evidence is no longer relevant because " 'the public no longer holds the presumed misconceptions this testimony purports to address.' " (*Id.* at p. 468.) There, the court held that it was bound by the high court's holding in *McAlpin*, *supra*, 53 Cal.3d 1289 that CSAAS evidence is admissible to rehabilitate a child sexual abuse victim's credibility and " ' "is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior." ' " (*People v. Munch*, at p. 468; see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We agree with the appellate court in *Munch* and conclude the evidence was probative under *McAlpin* based on the state of the evidence.

Appellant argues, on the other hand, the undue prejudice was high for the same reasons he argues the evidence exceeded the permissible scope of CSAAS evidence. We disagree the trial court abused its discretion by allowing the evidence. Evidence is not "prejudicial" merely because it may be harmful to a criminal defendant's case. (*People v. Megown* (2018) 28 Cal.App.5th 157, 164.) Evidence only creates "undue prejudice" if the evidence tends to evoke an emotional bias by the jurors against the defendant, and the evidence has little effect on the issues relevant in the particular case. (*Ibid.*) For the same reasons we have already discussed to conclude the testimony was within the limits of permissible CSAAS evidence, we conclude there was no undue prejudice resulting from the admission of Love's testimony. We find no abuse of discretion.

### 5.     *Alleged Due Process Violation*

Finally, appellant contends the admission of Love's testimony rendered appellant's trial fundamentally unfair so as to violate federal due process rights for the same reasons why he contends they exceeded the permissible scope of CSAAS testimony. We disagree.

A court's compliance with the rules of evidence ordinarily do not infringe on a defendant's right to a fair trial. (*People v. Hall* (1986) 41 Cal.3d 826, 834–835.) Here,

24.

appellant's due process claim is based on the premise that the admission of the CSAAS evidence violated state evidentiary law.  Because we have found no evidentiary errors regarding the admission of the CSAAS expert testimony (with the exception of one of Love's comments, which we have discussed *ante*), we are not persuaded by appellant's argument.  This court has rejected a claim that properly admitted CSAAS evidence violates due process:  "The United States Supreme Court has held the admission of relevant evidence of the battered child syndrome does not violate the due process clause of the Fourteenth Amendment.  (*Estelle v. McGuire* (1991) 502 U.S. 62, 69–70.)  Battered child syndrome evidence is analogous to CSAAS evidence.  (*People v. Bowke*r, *supra*, 203 Cal.App.3d at pp. 393–394.)  For this reason, there can be little doubt the due process dimensions of both types of evidence is similar if not identical.  Therefore, introduction of CSAAS testimony does not by itself deny appellant due process."  (*People v. Patino*, *supra*, 26 Cal.App.4th at p. 1747.)  We agree with this court's decision in *Patino* and find no due process violation.

### 6. Alleged Ineffective Assistance of Counsel Claim

Because Love's testimony was properly admitted, we reject appellant's argument that his counsel was ineffective in failing to object to it.  (See *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections."]; *People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile."].)

## II. Constitutionality of Section 288.5

Appellant contends section 288.5 violates his state constitutional right to a unanimous verdict and his federal constitutional rights to due process and a jury trial. We disagree.

Section 288.5, subdivision (a) defines the offense of "continuous sexual abuse of a child" as when "[a]ny person who either resides in the same home with the minor child or

has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct[4] with a child under the age of 14 years at the time of the commission of the offense, … or three or more acts of lewd or lascivious conduct,[5] … with a child under the age of 14 years at the time of the commission of the offense."  The statute specifies that a jury "need unanimously agree only that the requisite number of acts occurred not on which acts constitute the requisite number."  (§ 288.5, subd. (b).)  The prosecution is expressly prohibited by the statute from charging any other act of substantial sexual conduct or lewd and lascivious acts involving the same victim unless the acts occurred outside the time period specified in the section 288.5 charge or unless it is charged in the alternative.  (§ 288.5, subd. (c).)  The prosecution is also limited to charging a defendant with only one section 288.5 charge per victim.  (§ 288.5, subd. (c).)

"The starting point of our analysis is 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears." ' "  (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 568.)  We review the constitutionality of statutes de novo.  (*People v. Abbate* (2020) 58 Cal.App.5th 100, 109.)

Appellant first argues that section 288.5 violates the state constitution's guarantee of a right to a unanimous verdict by allowing for conviction without the juror's unanimous agreement on which specific acts constitute the offense.  Appellant acknowledges several appellate courts have rejected the same argument.  (*People v.*

---

**4**     "Substantial sexual conduct" is defined in section 1203.066, subdivision (b), as penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender.

**5**     Section 288 describes lewd and lascivious acts as when one willfully and lewdly commits any lewd or lascivious act, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child.

*Higgins* (1992) 9 Cal.App.4th 294, 299, 305–308; *People v. Avina* (1993) 14 Cal.App.4th 1303, 1308–1314 (*Avina*); *People v. Gear* (1993) 19 Cal.App.4th 86, 89–94; *People v. Whitham* (1995) 38 Cal.App.4th 1282, 1295–1298 (*Whitham*); *People v. Adames* (1997) 54 Cal.App.4th 198, 206–208; *People v. Cissna* (2010) 182 Cal.App.4th 1105, 1123–1126.) These courts have held that because section 288.5 is a "course-of-conduct" offense, it falls into an unanimity requirement exception because the actus reus of the offense is a series of acts rather than a specific act.

Appellant argues that these cases were wrongly decided and should not be followed because they are incorrect in categorizing section 288.5 as a course-of-conduct offense. Appellant distinguishes section 288.5 from the course-of-conduct offenses of child abuse (§ 273a), spousal battery (§ 273.5), animal cruelty (§ 597), accessory after the fact (§ 32), and dissuading a witness (§ 136.1). He argues those course-of-conduct crimes may be comprised of individual acts that are not themselves criminal, and none of those offenses requires a specific number of defined qualifying acts be committed over a specific time period, unlike section 288.5. On the other hand, according to appellant, section 288.5 is a composite crime consisting of three or more individual crimes committed over a minimum period of time, which is completed the instant the time period has run and the third qualifying crime has been committed. We disagree with appellant's assessment.

The question of whether an offense is a course-of-conduct offense focuses on whether the Legislature intended to make it one. (*Avina*, *supra*, 14 Cal.App.4th at p. 1310.) In the case of section 288.5, the Legislature "[o]bviously … *intended* to create a course-of-conduct offense" because subdivision (b) expressly states that it is to be treated as a continuous course-of-conduct crime for purposes of the unanimity rule. (*Avina*, at p. 1310; accord, *Whitham*, *supra*, 38 Cal.App.4th at p. 1296 ["The text of section 288.5 leaves no doubt the Legislature intended to create a course-of-conduct offense [citations]; it is undeniably ' "the continuing course of abuse which leads to

27.

prosecution and conviction." ' "]; *People v. Higgins*, *supra*, 9 Cal.App.4th at p. 304 ["The Legislature has the prerogative to proscribe a course of conduct, rather than specific acts, a prerogative exercised by adoption of [] section 288.5."].)

We agree with the courts who have rejected arguments similar to appellant's and find *Avina* particularly persuasive. In rejecting the defendant's argument that section 288.5 is a "composite" crime, the *Avina* court held that section 288.5's requirement the defendant commit three or more acts of sexual abuse against the child, any one of which would be criminal in itself, was not dispositive because "[s]everal statutes held to define course-of-conduct crimes may also be violated by a single act; these include child abuse (§ 273a), spousal battery (§ 273.5), and dissuasion of a witness (§ 136.1). That section 288.5 can, in theory, be violated by committing only three individual acts does not remove it from the course-of-conduct category." (*Avina*, *supra*, 14 Cal.App.4th at p. 1310.)

The *Avina* court thoroughly explained the course-of-conduct characteristics of the offense. First, the *Avina* court explained that "section 288.5 defines the offense more narrowly than as a series of three molestations." (*Avina*, *supra*, 14 Cal.App.4th at p. 1310.) The statute also requires "residence with or recurring access to the child victim, as well as sexual abuse over a period of three months or more." (*Id.* at p. 1310–1311.) The *Avina* court reasoned that "[t]he three-act requirement merely sets a 'baseline' for measuring the course of conduct, while 'the continuous-access requirement makes clear that the statute was targeted at the resident child abuse situation, where problems with generic testimony are most likely to arise, and was not to be used against individuals who have only transient contact with the alleged victim.' " (*Id.* at p. 1311.)

The *Avina* court went on to liken residential sexual abuse with other course-of-conduct crimes. Even though each act contemplated in section 288.5 may be criminal, the *Avina* court explained, "the harm done to the victim is cumulative and may be exacerbated not only by frequent repetition, but by the very circumstances of residential

28.

intimacy that make the course of conduct possible." (*Avina*, *supra*, 14 Cal.App.4th at p. 1311.)

Finally, the *Avina* court pointed out that section 288.5 has another characteristic of a course-of-conduct crime that is of "substantial benefit to a defendant"—that the prosecution may only charge one count per victim. (*Avina*, *supra*, 14 Cal.App.4th at p. 1311.) We find *Avina* well-reasoned and persuasive on the point that contrary to appellant's argument, section 288.5 is a course-of-conduct offense and unanimity as to the specific acts that make up the offense is not required.

Appellant also contends section 288.5 violates his federal constitutional rights to due process and a jury trial because these rights require the prosecution to prove every element of the offense to the jury beyond a reasonable doubt. We disagree. " 'Courts presume a statute is constitutional. [Citation.] … To show a violation of due process, a defendant must show that the statute, as applied, offended a principle of justice so rooted in the traditions and consciousness of the country that it is considered fundamental.' " (*People v. Robertson* (2012) 208 Cal.App.4th 965, 995.)

Here, "it is the number of acts of molestation which is the essential element of the crime," not the acts themselves. (*Whitham*, *supra*, 38 Cal.App.4th at p. 1297.) Appellant has cited no authority which stands for the proposition that, when more than one act can make up the element of an offense, a jury must unanimously agree on the act that constitutes that element. (See *People v. Leffel* (1988) 203 Cal.App.3d 575, 586 [suggesting there is no such requirement].) Under section 288.5, the jury is required to find beyond a reasonable doubt that a defendant committed three or more qualifying acts, which is all that is constitutionally required because the number of acts over a prolonged period of time is the actus reus, not the acts themselves. Appellant has not shown his due process right to a verdict beyond a reasonable doubt has been violated.

29.

**III.    Sentencing Errors**

### A.    *Unauthorized Indeterminate Sentences Pursuant to Section 667.61*

Appellant contends the indeterminate sentences imposed based on multiple victim allegations under section 667.61 were unauthorized.  Respondent concedes the sentences violated ex post facto laws.  We accept respondent's concession.

Section 667.61 provides that when certain enumerated offenses are perpetrated against multiple victims, those offenses shall be punishable by prison terms of 15 years to life.  (§ 667.61, subds. (b), (c) & (e)(4).)  Both section 288, subdivision (a) and section 288.5 are listed.  (§ 661.61, subd. (c)(8) & (9).)  Section 288.5, however, was not added to the list until September 20, 2006.  (Stats. 2006, ch. 337, § 33, eff. Sept. 20, 2006.)  In the present case, count 3 was alleged to have occurred between March 27, 2006, and March 26, 2013.

Both the federal and state constitutions prohibit ex post facto laws.  (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9; *Collins v. Youngblood* (1990) 497 U.S. 37, 41; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288.)  We interpret the state ex post facto clause no differently than its federal counterpart.  (*People v. Snook* (1997) 16 Cal.4th 1210, 1220.)

"The standard for determining whether a law violates the ex post facto clause has two components, 'a law must be retrospective—that is, "it must apply to events occurring before its enactment"—and it "must disadvantage the offender affected by it" … by altering the definition of criminal conduct or increasing the punishment for the crime….' " (*People v. Delgado* (2006) 140 Cal.App.4th 1157, 1164.)

The maximum penalty that may be imposed on appellant depends upon whether he committed the offense before or after the effective date of section 667.61.  Therefore, to invoke the sentencing provisions of section 667.61, the prosecutor had to prove to the jury that appellant committed those offenses on or after the statute's effective date.  (See *People v. Hiscox* (2006) 136 Cal.App.4th 253, 260.)

Because the jury was not required to make a unanimous finding that appellant committed the offense after September 20, 2006, and because the jury could have found he committed the section 288.5 offense prior to the September 20, 2006, effective date of section 667.61, the law may have applied to events occurring before its enactment.

Appellant's 15-year-to-life terms imposed on counts 1 and 3 must be vacated and the matter remanded for resentencing under the law in effect prior to September 20, 2006.

### B.      Error Imposing Consecutive Sentences

Appellant contends the trial court imposed consecutive sentences under the mistaken impression it was required to under section 667.6, subdivision (d), which did not apply in appellant's case. Respondent concedes the trial court erroneously thought consecutive terms were mandated for counts 1 and 3 and that remand is appropriate. We accept respondent's concession.

Section 667.6 provides that a full, separate, and consecutive term shall be imposed for each violation of enumerated offenses if the crimes involve separate victims or involve the same victim on separate occasions. The statute " 'applies only when a defendant stands convicted of more than one offense specified.' " (*People v. Maharaj* (2012) 204 Cal.App.4th 641, 649, italics omitted.)

Here, the only offense appellant was convicted, which is enumerated in the list, is section 288.5. (§ 667.6, subd. (e).) However, the trial court indicated it was required to impose consecutive sentences under section 667.6, subdivision (d), expressed it did not "like the idea of a life sentence in this case," and expressly stated that the mandatory consecutive sentences was what the court believed was "the problem [with sentencing] in this case."

Because section 667.6, subdivision (d) did not apply, and the trial court imposed full, consecutive sentences because it believed the subdivision did apply, the matter must be remanded for resentencing for the trial court to properly exercise its discretion as to whether to impose consecutive or concurrent sentences on counts 1 and 3.

31.

## C. Dueñas Claim

At appellant's sentencing, the court imposed the minimum restitution fine of $300 (§ 1202.4). The court found appellant did not have the ability to pay the probation report fee of $296, but stated it was required to impose a courtroom security fee of $40 for each conviction for a total of $120 (§ 1465.8) and a $30 criminal conviction assessment for each conviction for a total of $90 (Gov. Code, § 70373).

Since appellant's sentencing, the Second Appellate District decided *Dueñas*, *supra*, 30 Cal.App.5th 1157. In *Dueñas*, the appellate court held the imposition of the nonpunitive court security fee (§ 1465.8, subd. (a)(1)) and criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)) without a determination of the defendant's ability to pay them violated due process. (*Dueñas*, at p. 1164.) The *Dueñas* court also held that if the defendant has demonstrated an inability to pay the restitution fine, which is intended to be punitive (§ 1202.4, subd. (b)(1)), the trial court must stay execution of the fine until the People prove the defendant has gained the ability to pay. (*Dueñas*, at p. 1164.)[6]

Relying on *Dueñas*, appellant asserts his rights to due process and to be free from excessive fines were violated by the court imposing the $120 court security fee, the $90 criminal conviction assessment, and the $300 restitution fine despite its finding appellant had the inability to pay them. Respondent takes the position that since the matter is being remanded, appellant should raise his ability-to-pay claim below. We agree with respondent.

Upon remand, appellant "will bear the burden of both demonstrating a harm of constitutional magnitude and making a record regarding his alleged inability to pay the restitution fine and court assessments." (*People v. Montes* (2021) 59 Cal.App.5th 1107, 1121; see *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 ["[A] defendant must in

---

**6** The California Supreme Court is now considering (1) whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and (2) if so, which party bears the applicable burden of proof. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, rev. granted Nov. 13, 2019, S257844.)

the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed and at a hearing present evidence of his or her inability to pay the amounts contemplated by the trial court."].) "[W]e express no view as to whether defendant may be able to state a viable claim that ultimately withstands constitutional scrutiny on review." (*People v. Montes*, at p. 1121.)

## DISPOSITION

Appellant's sentences imposed on counts 1 and 3 are vacated and the matter is remanded for resentencing. Upon remand, the court shall apply the law in effect prior to the amendment of section 667.61 on September 20, 2006, and properly exercise its discretion as to whether to impose consecutive or concurrent sentences. If appellant chooses, he may request an ability-to-pay hearing where he will bear the burden of showing a harm of constitutional magnitude and to make a record regarding his alleged inability to pay.

In all other respects, the judgment is affirmed.


DE SANTOS, J.

WE CONCUR:


DETJEN, Acting P.J.


PEÑA, J.

33.